Pennsylvania Forge Corporation v. Commissioner.
Pennsylvania Forge Corp. v. Commissioner
Docket No. 107107.
United States Tax Court
1943 Tax Ct. Memo LEXIS 130; 2 T.C.M. (CCH) 723; T.C.M. (RIA) 43409; September 6, 1943
*130 Leland T. Atherton, Esq., for the petitioner. Bernard D. Daniels, Esq., and Harry Brown, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income and excess profits taxes in the respective amounts of $47,336.40, and $1,169.11 for the year 1937. Certain adjustments are not contested. The questions in issue are: (1) Whether petitioner is entitled to a deduction from gross income for the year 1937 for payments of taxes and interest of its subsidiary in the amount of $3,368.45 as ordinary and necessary business expenses. (2) Whether petitioner is entitled to a deduction from gross income in the amount of $5,285.02 for the year 1937 as an addition to reserve for bad debts. (3) Whether in computing "undistributed net income" petitioner is entitled to a credit under the provisions of section 26(c)(1), (3), and 26(f) of the Revenue Act of 1936, which was added by section 501(a) of the Revenue Act of 1942. The return was filed with the collector for the first district of Pennsylvania. Petitioner is a Pennsylvania corporation organized in 1928, having its principal place of business in Philadelphia, Pennsylvania. *131 Its business is the manufacture of steel forgings. Petitioner kept its books and filed its returns on the accrual basis. The issues presented will be considered in order. 1. Deductibility of Certain Payments of Taxes and Interest as Ordinary and Necessary Business Expenses FACTS: - Prior to April 1, 1921, the Pennsylvania Forge Company, a Pennsylvania corporation, executed two purchase money mortgages on its real estate in the total face amount of $24,000. The Pennsylvania Forge Company was a wholly-owned subsidiary of petitioner during the taxable year. On April 1, 1921, the Pennsylvania Forge Company executed a corporate mortgage or deed of trust to the Land Title & Trust Company, a Pennsylvania Corporation, as trustee, whereby it conveyed all of its real estate, structures, machinery, tools, and equipment to the trustee to secure the payment of interest and principal of an issue of first mortgage six percent gold bonds in the face amount of $500,000. Under the terms of this corporate mortgage, the Pennsylvania Forge Company agreed as follows: Company covenants and agrees that, having possession as aforesaid, it will diligently preserve the rights and franchises now or *132 hereafter granted to or conferred upon it by the laws of the United States, or of the said State of Pennsylvania, * * * Company hereby covenants and agrees from time to time, and in every case on or before the last day of December in the current year in which the same shall be due and payable, to pay and discharge all taxes, assessments and governmental charges or levies legally imposed upon the income and profits thereof, or upon any property, real, personal and mixed, above referred to, or any part thereof, the lien whereof might or could be held to be prior to the lien of these presents, so that the same shall not fall into arrears, and so that the priority of the lien of this Indenture shall be duly preserved, and it shall not and will not knowingly do or suffer any manner or thing whatsoever whereby the lien of this Indenture might or could be impaired until the said bonds hereby secured with all the interest accrued thereon, shall have been fully paid and satisfied. * * * * *
Company further covenants and agrees that it will not knowingly create or suffer any mechanics', laborers' or any other lien whatsoever to be created upon the said mortgaged property, whereby the lien *133 of this Indenture might or could be impaired, until the said bonds hereby secured, with all the interest accrued thereon, shall have been fully paid and satisfied. On December 31, 1928, the Pennsylvania Forge Company sold all of its assets, with the exception of its real estate, to the Regnaw Corporation, a Delaware corporation. On the same day, the Regnaw Corporation resold all of the assets it had purchased from the Pennsylvania Forge Company, with the exception of cash, to petitioner. This sale was upon terms set forth in the minutes of a meeting of the petitioner's board of directors, as follows: A proposal was received from Regnaw Corporation to sell to Pennsylvania Forge Corporation all of the assets of Pennsylvania Forge Company as of December 31, 1928 - excepting only cash in Bank - including its machinery, tools, implements, work in process, finished products, and book accounts, as well as the assignment of a certain lease and option to purchase made with Pennsylvania Forge Company by Girard Smelting & Refining Company, and subject, however, to the liability of Pennsylvania Forge Company as of the date of December 31, 1928; and to secure the release from the lien of a *134 certain corporate mortgage to secure bonds to the face or par value of $500,000 - of all machinery, implements, buildings, structures, erected upon the real estate of Pennsylvania Forge Company at Ash & Bath Streets, Bridesburg, Philadelphia, Pa. on the condition that Pennsylvania Forge Corporation shall become surety for any deficit in principal or interest which on January 1, 1929 shall be past due, on said bonds; and further to secure the cancellation of a certain note for $178,200, dated April 1, 1924, and drawn by Pennsylvania Forge Company to its own order and by it endorsed; and further, to secure good and sufficient subscription for not less than $100,000 face or parvalue of the proposed 7% prior preference stock of Pennsylvania Forge Corporation, at par; for and on consideration that the Pennsylvania Forge Corporation would issue to said Regnaw Corporation in exchange therefor, its prior preference stock in the amount of 135 shares of the face or par value of $13,500 together with 4,038 shares of the proposed preferred stock of Pennsylvania Forge Corporation of the face or par value of $403,800 and together with 15,000 shares of the common stock of Pennsylvania Forge Corporation *135 having no par or face value. After a full consideration of the foregoing proposal the Board of Directors unanimously resolve that the property offered by said Regnaw Corporation in exchange for stock of Pennsylvania Forge Corporation as aforesaid, was of the full value of 13,500 shares of prior preference stock; 4,038 shares of preferred stock and 15,000 shares of common stock and directed the proper officers of Pennsylvania Forge Corporation to enter into a binding contract with Regnaw Corporation for the purchase of the assets of Pennsylvania Forge Company as aforesaid. On April 1, 1929, petitioner entered into a written agreement with the Pennsylvania Forge Company, Real Estate-Land Title & Trust Company, successor to the Land Title & Trust Company, and the bondholders of the first mortgage 6 percent gold bonds of Pennsylvania Forge Company, whereby the time for payment of the principal of the bonds was extended to April 1, 1932. That agreement contained the following provisions: Pennsylvania Forge Company hereby guarantees the unconditioned payment of said bonds at their extended maturity together with all unpaid interest coupons. Pennsylvania Forge Corporation, for a consideration *136 as aforesaid, hereby becomes surety for the prompt and punctual performance by Pennsylvania Forge Company of all the terms and conditions of the original corporate mortgage and deed of trust as made by said Pennsylvania Forge Company - and as well as for all the terms and conditions of this agreement. On April 1, 1932, the time for payment of the principal of the bonds was extended to April 1, 1935. Under the provisions of the extension agreement, petitioner continued to be "surety" to the same extent as provided in the agreement of April 1, 1929. On September 1, 1933, petitioner became a party to a written agreement between Pennsylvania Forge Company, members of a reorganization committee of petitioner, and the bondholders of Pennsylvania Forge Company, whereby all the bondholders, with the exception of Charles C. Davis, released petitioner from its liability for the payment of the principal and interest on the first mortgage six percent gold bonds of Pennsylvania Forge Company, and extended the time for payment thereof to April 1, 1945. The Pennsylvania Forge Company ceased doing business on December 31, 1928, and it had received no income since that date. During the year 1937, *137 the Pennsylvania Forge Company was still in existence and its only asset was title to real estate on which its plant was formerly located. In the year 1937, the Pennsylvania Forge Company was in default in the payment of real estate taxes assessed against its retained real estate in the amount of $1,391.25. During the year 1937, the purchase money mortgages and $441,000 face amount of bonds, plus accrued interest, were still outstanding. During the year 1937, petitioner owned all of the outstanding stock of the Pennsylvania Forge Company. During the taxable year, petitioner made certain payments aggregating the sum of $3,368.45, for the account of the Pennsylvania Forge Company, as follows: (a) Real estate taxes in the amount of $1,391.25 for the year 1937 assessed against Pennsylvania Forge Company with respect to land owned by that company. (b) Federal documentary stamps in the amount of $441.00 purchased and used in connection with the extension agreement dated September 1, 1933, relating to the First Mortgage 6 percent Gold Bonds issued under the mortgage of Pennsylvania Forge Company, dated April 1, 1921. (c) Pennsylvania capital stock and corporation loans tax of the *138 Pennsylvania Forge Company for the year 1937 in the respective amounts of $5 and $91.20. (d) Interest for the year 1937 in the amount of $1,440 on two mortgages of the Pennsylvania Forge Company executed prior to April 1, 1921. The Pennsylvania Forge Company is a distinct and separate corporate entity, and taxes and interest owed by it are not expenses of petitioner. OPINION: - The question under this issue is whether the amounts of interest and taxes paid by petitioner on behalf of its wholly-owned subsidiary are deductible by petitioner as ordinary and necessary business expenses. Petitioner contends that these amounts are deductible on the theory that the separate corporate entity of the subsidiary should be disregarded and the payments should be considered as having been made for the benefit of petitioner. It also claims that it is entitled to these deductions on the ground that it was contractually obligated to make the payments. No contention is made that the payments are deductible as payments of interest and taxes. The question turns solely on whether they are ordinary and necessary business expenses. Respondent contends that the corporate entity of the subsidiary must *139 be respected and that the payments are in the nature of capital expenditures rather than ordinary and necessary business expenses. Respondent's contentions must be sustained. In , the court said: * * * The courts, however, will not disregard corporate entities merely because of a parent - subsidiary relationship; (C.C.A. 8th, 1942); (C.C.A. 4th, 1942); (C.C.A. 5th, 1921); they will look behind the intercorporate set up only if there is evidence of a purpose to evade a statute or to practice fraud upon third persons. (C.C.A. 8th, 1940); (C.C.A. 4th, 1942). The facts in this case do not present grounds upon which the corporate entity of petitioner's subsidiary may be disregarded. *140 The subsidiary was in existence prior to the existence of petitioner. The realty of the subsidiary was never owned or used by petitioner. If the realty were sold at a profit, the subsidiary would be liable for tax upon that profit. Apparently, the subsidiary's chief reason for existence during the taxable year was to continue to serve as the legal obligor upon the outstanding bond indebtedness and mortgages. In that connection, it had guaranteed payment of principal and interest upon a bonded indebtedness of $500,000. In this capacity, it relieved petitioner from liability. Petitioner apparently desired to avoid the direct assumption of the outstanding indebtedness of the subsidiary, and for that reason, it did not liquidate the subsidiary and take over its remaining property. All of these facts indicate that petitioner was of the opinion, and apparently good business sense dictated, that the two corporations should preserve their separate identities. In , the Court said: * * * A taxpayer is free to adopt such organizations for his affairs as he may choose but having elected to do some business as a corporation, he must *141 accept the tax disadvantage. The same principle was reiterated by the Supreme Court in the recent case of . Here, petitioner expended money to keep its subsidiary in existence as a bulwark against mortgage liability. It certainly would not be equitable to treat the subsidiary as a fact as against its creditors and a fiction against the Government. . Petitioner further contends that the payments of interest and taxes made in behalf of its subsidiary are deductible as ordinary and necessary business expenses on the ground that it was contractually obligated to make them. That obligation, however, arose from the purchase by petitioner of the subsidiary's assets. That purchase was "subject, however, to the liability of Pennsylvania Forge Company." In order to secure those assets free from the lien of the bond indenture, petitioner became surety for the performance by the subsidiary of all the provisions of the original bond indenture. Under those provisions, the subsidiary was required to pay all charges *142 which might impair the lien of the indenture. The payments by petitioner of the real estate taxes, Federal documentary stamp tax, and Pennsylvania capital stock and corporation loans taxes were payments of obligations which the subsidiary was required to make under the terms of the bond indenture and in which it was in default. Petitioner made these payments in accordance with its obligation which arose as consideration for the release of its property from the lien of the bond indenture. The amounts so paid were, as to petitioner, part of the consideration paid for the property previously owned by the subsidiary. They were, therefore, capital expenditures rather than ordinary and necessary business expenses. ; certiorari denied, ; ; ; and ; modified on another issue, . Petitioner paid *143 interest in the sum of $1,440 on two mortgages of the Pennsylvania Forge Company which were executed prior to the bond indenture. It was under no contractual obligation to make these payments. They were made by petitioner because the subsidiary did not have any funds of its own. Petitioner could have liquidated its subsidiary, but for business reasons wanted to keep it in existence. Since the subsidiary was without funds, it was necessary for petitioner to pay its corporate expenses. The payment of interest owed by the subsidiary was in the nature of a capital expenditure to protect petitioner's capital investment in the stock of its subsidiary. ; modified on another issue, ; certiorari denied, ; . Accordingly, it is held that the payments of interest and taxes by petitioner are not deductible as ordinary and necessary business expenses. II. Deductibility of the Addition to Reserve for Bad Debts FACTS: - Petitioner used the reserve method for charging off uncollectible *144 and worthless accounts receivable, and adopted the prior practice of Pennsylvania Forge Company, in making additions to its reserve for bad debts by crediting thereto one-quarter of one percent of its gross sales. The statement of reserve for bad debts, from 1929 to 1937 inclusive, as computed by petitioner from its books is as follows: Additions
Uncollected
to Reserve for
End of
Accounts
Bad Debts
Year Reserve
Charged
Year
Gross sales
at 1/4 of 1%
Balance
to Reserve
Recoveries
1929
$1,043,945.66
$ 2,618.78
* $ 4,815.67
$ 1,284.45
1930
878,347.54
2,174.16
5,540.23
2,634.20
$1,184.60
1931
576,488.22
1,417.67
7,132.54
450.15
624.79
1932
243,415.31
601.98
5,262.48
2,614.34
142.30
1933
347,712.76
* 11,202.91
5,086.19
** 11,459.77
80.57
1934
626,115.59
1,562.47
6,106.64
650.02
108.00
1935
900,374.62
2,249.10
8,536.54
154.05
334.85
1936
1,235,186.60
3,086.42
12,116.74
(c) 5.78
(c) 499.56
1937
2,103,626.99
5,285.02
17,425.94
237.37
261.55
Totals
$7,955,213.29
$30,198.51
$19,490.53
$3,236.22
*145 All of petitioner's accounts receivable, four months or more old, outstanding as of December 31, 1936, were collected in the year 1937. Petitioner's total accounts receivable as of December 31, 1937, amounted to $191,559.17 of which $8,612.67 was more than 90 days old. Of the accounts receivable as of December 31, 1937, petitioner in 1938 charged off the sum of $1,047.17 as worthless. Respondent's computation of petitioner's corrected reserves as of December 31, 1936, and December 31, 1937, is as follows: Reserve for bad debts per
books 12/31/35
$8,536.54
Credit recoveries
756.62
$9,293.16
Accounts charged off in 1936
262.84
Amended reserve 12/31/36
9,030.32
Credit recoveries for 1937
261.55
Total
9,291.87
Accounts charged off in 1937
237.37
Amended reserve 12/31/37
$9,054.50
OPINION: - The question in this issue is whether petitioner is entitled to a deduction from gross income in the amount of $5,285.02 as an addition to its reserve for bad debts for the year 1937. This issue is to be determined under section 23 (k) of the Revenue Act of 1936, which authorized petitioner to deduct "Debts ascertained to be worthless and charged off within the taxable *146 year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); * * *" Petitioner contends that the addition to its reserve for bad debts should be allowed because the same formula had been used during the past years to compute additions and had been allowed by respondent in those years. It also argues that the increases in its business during the taxable year necessitated the addition. Under the provisions of the statute, a taxpayer has an absolute right to choose to deduct his worthless debts when they are ascertained to be worthless and charged off, but if instead he chooses to deduct additions to a reserve, he subjects himself to the reasonable discretion of the Commissioner. Reserves of any sort are not ordinarily deductible, . Therefore, unless an abuse of discretion is proven, respondent's determination must be approved. In , the Court stated: * * * It is not without significance, therefore. that under the quoted provisions the additions to the reserve must be reasonable *147 and allowable only in the discretion of the Commissioner. While the Commissioner's exercise of his discretion in this respect is subject to review (cf. ), his determination of a reasonable addition to a reserve is not to be lightly set aside. The burden is on plaintiff to show that the additions which the Commissioner has allowed to the reserve as deductions from income for the years involved are not reasonable. In this there is more than a mere presumption of the correctness of the Commissioner's determination. In addition, we are reviewing exercised discretion which has been confided in the Commissioner. * * * It is immaterial that the formula used by petitioner in the taxable year was used by it for a long period of time to determine additions to reserve for bad debts and the additions so determined have been approved by respondent. . The test is whether the amount ultimately determined, regardless of formula, constitutes a reasonable addition to petitioner's reserve. What constitutes *148 a reasonable addition will depend upon the facts and circumstances of the business engaged in with relation to general business conditions. ; affd., . Petitioner sustained a bad debt loss of slightly over $11,000 in 1933. From that year to the end of 1937, petitioner did not charge off to reserve an amount in any one year in excess of $650.02, and in the last three years of that period, the recoveries exceeded the charge-offs. It is a known fact that 1933 was an abnormal year, but since that time, petitioner's business became progressively better while its bad debt losses became smaller. There was no reason to believe that petitioner would sustain larger debt losses as all the accounts receivable, four months or more old, outstanding as of December 31, 1936, were collected in the year 1937. The record also shows that of $191,559.17 accounts receivable outstanding as of December 31, 1937, only $8,612.67 of them were more than 90 days old. At December 31, 1937, petitioner had an amended reserve of over $9,000 which in the light of the past experience and circumstances of petitioner *149 would certainly seem to be sufficient. Also, the fact that petitioner in 1938 charged off only $1,047.17 of the accounts receivable as of December 31, 1937, as worthless, would tend to substantiate this finding. Petitioner relies primarily on , as authority for its contention that its addition to reserve for bad debts was reasonable. In that case, a formula similar to the one used by petitioner was employed and it was held that the addition so obtained was reasonable. However, it was found in that case that a considerable percentage of accounts which had been uncollected for more than 90 days were never collected and the addition was reasonable in order to provide for the ensuing charge-offs. Petitioner also relies on , affd., . However, in that case, the additions to reserve for bad debts were just sufficient to care for the actual bad debts. Under all the circumstances, we cannot find that respondent abused his discretion. It is therefore held that respondent's disallowance of the deduction claimed *150 by petitioner for an addition to its reserve for bad debts was not unreasonable or arbitrary, and accordingly his determination is approved. III. Credit for Purpose of Computing "Undistributed Net Income" Under Sections 26 (c) (1), (3), and 26 (f) FACTS: - In September of 1933, petitioner had outstanding capital stock as follows: 2,668 shares of prior preference stock, $100 par value; 4,038 shares of preferred stock, $100 par value; and 12,000 shares of common stock of no par value. Petitioner had been paid the amount of $667,100 for all of this stock. In October of 1933, petitioner's articles of incorporation were amended to authorize an increase in common stock so that the total authorized stock was as follows: 2,668 shares of prior preference stock, $100 par value; 4,038 shares of preferred stock, $100 par value; and 100,000 shares of common stock of no par value. In December of 1933, petitioner issued 5,981 1/2 shares of common stock in exchange for the then outstanding prior preference, preferred, and common stock. Upon the consummation of this exchange, petitioner's capital stock account showed the amount of $667,100 as the consideration received for the 5,981 1/2 shares *151 of common stock. Immediately after this exchange, petitioner's capital stock account was debited by the amount of $600,390, which amount was credited to petitioner's capital surplus account. Under the terms of the agreement dated September 1, 1933, the bondholders were given the right to subscribe to petitioner's common stock $3at per share. This right was given to all the bondholders, with the exception of Davis, as consideration for the extension of the maturity date of the bonds and the release of petitioner from its guaranty of the payment of the interest and principal of said bonds. In December of 1933, petitioner issued 25,125 1/2 additional shares of common stock for a consideration of $3 per share and credited its capital stock account with the sum of $75,376.50. These shares were subscribed to by bondholders and certain stockholders of petitioner. In June of 1934, petitioner retired 28 shares of its common stock at $3 per share and debited its capital stock account in the amount of $84. In the respective years of 1935 and 1936, petitioner issued 1,000 shares of its common stock for a consideration of $3 per share and credited its capital stock account in each year in *152 the amount of $3,000. Petitioner's outstanding capital stock as of December 31, 1936, consisted of 33,079 shares of common stock. No additional stock was issued by petitioner in the year 1937. Petitioner carried this stock on its books at $148,002.50. This sum does not include the amount of $600,390, paid in for such stock but transferred to petitioner's capital surplus. During the years 1929 to 1936, inclusive, petitioner paid the amount of $15,700.88 for real estate taxes on land of the Pennsylvania Forge Company pursuant to its obligations as surety for the performance of the terms of the original bond indenture by the Pennsylvania Forge Company. During the same period, petitioner paid the sum of $11,520 as interest on the purchase money mortgages of its subsidiary. The taxes and interest so paid were claimed and allowed as deductions with respect to petitioner's tax liability for those years. Pursuant to its liability as guarantor of the payment of the principal and interest on the bonds, petitioner accrued the interest on its books as a liability and deducted it from its earnings and profits. As of September 1, 1933, petitioner had so accrued the amount of $67,215 on its books *153 as interest on all the outstanding bonds with the exception of $25,000 face amount of bonds held by Davis. Petitioner credited this amount of $67,215 to its capital surplus account upon being released on September 1, 1933, by all the bondholders, with the exception of Davis, from any and all liability in respect to the bonds. As of December 31, 1934, petitioner had an unadjusted deficit in accumulated earnings and profits of $365,340.30. This deficit was transferred to petitioner's capital surplus account. Petitioner's balance sheets as of December 31, 1936, and December 31, 1937, were as follows: December 31, 1936
December 31, 1937
Cash
$ 5,225.75
$ 46,335.44
Notes Receivable
1,488.32
888.32
Accounts Receivable
154,957.36
191,559.17
Inventories
284,683.97
436,362.76
Bonds of Penna. Forge Co
38,000.00
38,000.00
Deferred Charges
3,518.50
4,570.94
Land
81,500.00
81,500.00
Buildings
102,803.51
123,135.37
Machinery and Equipment
596,469.96
548,365.58
Dies
18,410.40
21,269.69
Construction Work
7,925.07
1,637.00
$1,294,982.84
$1,493,624.27
LIABILITIES AND CAPITAL
Notes Payable
34,675.00
14,937.50
Accounts Payable
161,499.78
68,020.42
Mortgages Payable
200,000.00
215,626.25
Accrued Interest
6,058.00
6,488.00
Accrued Taxes
21,693.32
82,562.78
Other Accrued Expenses
9,648.61
14,683.96
Reserve for Bad Debts
12,116.74
17,425.94
Reserve for Depreciation
289,949.95
297,520.50
Capital Stock
148,002.50
148,002.50
Surplus
105,710.73
322,678.21
Paid in or Capital Surplus
305,678.21
305,678.21
$1,294,982.84
$1,493,624.27
*154 Petitioner's surplus as of December 31, 1936, which is shown in the above balance sheet at $105,710.73, does not reflect additional accruals in Federal income and Pennsylvania State taxes for the year 1936 in the respective amounts of $669.32 and $1,058; nor does it reflect a decrease in the reserve for bad debts for the year 1936 in the amount of $3,086.42. Petitioner's balance sheets for the years 1936 and 1937 do not show unrealized appreciation in value of assets in the amount of $611,188.51, as reflected on petitioner's books; nor is there shown in the balance sheets any surplus through unrealized appreciation in the amount of $611,188.51, as reflected on petitioner's books. Petitioner's summary profit and loss statement for the year ended December 31, 1937, shows a "Net Income before Federal Income and Excess Profits Taxes" in the amount of $275,014.31. Petitioner's net sales during 1937 were in the amount of $2,078,255.86. During the year 1937, petitioner paid $127.89 in charges to its bank for low bank balances and $418.67 in interest to trade creditors for unpaid account balances. During the period January 1 to September 1, 1937, petitioner's unfilled orders increased *155 from $250,000 to $381,000; and from September 1 to December 31, 1937, decreased to $240,000. The increase in volume of business required the use of available cash to purchase raw materials. A decline in orders did not release cash for other purposes until four or six months after the decline started. No dividends of any kind were declared or paid on petitioner's capital stock during the taxable year 1937, nor in any year after 1930. Petitioner at the end of the taxable year was being pressed regarding its liability as guarantor in respect to the $25,000 face amount of its subsidiary's bonds. On January 2, 1933, petitioner executed a bond and mortgage in the amount of $200,000 to the Pennsylvania Company for Insurance on Lives and Granting Annuities which matured five years thereafter. Petitioner was given the privilege of extending payment thereof for a further period of two years by paying $50,000 of the indebtedness on January 2, 1938. In January 1938, petitioner entered into negotiations with the Pennsylvania Company relative to this indebtedness. Petitioner was unable to make the $50,000 payment. Later in January 1938, the petitioner paid $25,000 on account of the reduction *156 of the said indebtedness. On March 30, 1937, petitioner executed a mortgage for the sum of $25,000 to the Pennsylvania Company for Insurance on Lives and Granting Annuities which matured two years from the date thereof. This loan was needed to lengthen petitioner's forge shop building, and it was guaranteed by the Federal Housing Administration. On July 1, 1933, petitioner was indebted to five creditors in the total sum of $119,500. On that date, it agreed to pay each creditor 12 1/2 percent of the indebtedness, and to execute and deliver to each creditor seven notes, each representing 12 1/2 percent of the indebtedness. The notes were payable semiannually, beginning on December 31, 1933, and terminating on December 31, 1936. The agreement provided that upon certain conditions a portion of the indebtedness might be postponed until June 30, 1937. Paragraph 7 of this agreement reads as follows: "Until the notes hereinbefore mentioned are paid in full no dividends shall be declared upon the capital stock of The Corporation." As of December 31, 1936, there was outstanding and unpaid a balance of $29,875.00 of the principal amount of the indebtedness referred to in the agreement dated *157 July 1, 1933. On June 30, 1937, petitioner paid $14,937.50 on account of this indebtedness. On December 31, 1937, $14,937.50 of the indebtedness was outstanding and unpaid. The unpaid balance of the indebtedness as of December 31, 1937, was paid as follows: $ 7,468.75
on February 4, 1938.
7,468.75
on April 11, 1938.
$14,937.50
In its return for the year 1937, petitioner in computing its undistributed profits surtax took the amount of $217,348.50, which amount was its adjusted net income, as a credit arising from a contract restricting dividend payments under section 26 (c) (1) of the Revenue Act of 1936. Respondent disallowed the credit for the reason that he determined that the instrument on which the claim for such credit was based did not satisfy the conditions prescribed by section 26 (c) (1) of the Revenue Act of 1936. Petitioner is entitled to a credit in the amount of its adjusted net income in computing its undistributed net income for the taxable year. OPINION. - The question in this issue is whether petitioner is entitled to a credit in the computation of its surtax on undistributed income for the taxable year. The question was originally submitted under *158 the provisions of section 26 (c) (1) [1] of the Revenue Act of 1936. Subsequent to the hearing of this proceeding, petitioner moved to amend its pleadings to claim the benefit of sections 26 (c) (3) as amended by section 501 (a) of the Revenue Act of 1942 and 26 (f), a new provision added by section 501 (a) of the Revenue Act of 1942, the pertinent provisions of which are set forth in the margin. [2] Petitioner's motion was granted, its pleadings were amended, and an additional hearing was held to consider the applicability of the amendments and new provisions of the statute. *159 Section 26 (c) (4), which was added by section 501 (a), provides that if more than one of the credits provided in sections 26 (c) (1), (2), or (3) apply, then the subsection which allows the greatest credit shall be applied. Section 14 (a) (2), as amended by section 501 (a) of the Revenue Act of 1942, provides that if section 26 (c) (1) is applicable, the credit as provided by section 26 (f) is not applicable in computing undistributed net income. If section 26 (c) (1) applies, petitioner is entitled to a credit in the amount of its adjusted net income for the taxable year, which, as adjusted by respondent was in the amount of $224,636. If section 26 (c) (3) is applicable, petitioner is entitled to a credit in the amount of its deficit in accumulated earnings and profits as of the close of the preceding taxable year. It is therefore necessary to determine the amount of that deficit in order to determine which provision of the statute is to be applied. Respondent agrees that petitioner's deficit in accumulated earnings and profits as of December 31, 1936, was at least $163,834.59. Petitioner contends that this amount should be increased by the following sums: $11,520 paid for mortgage *160 interest; $15,700.88 paid for real estate taxes; and $67,215 accrued for bond interest. Petitioner argues that these amounts were ordinary and necessary business expenses, that they were claimed and allowed as deductions in computing its taxable net income, that such amounts were proper charges against its earnings and profits; and, therefore, that its deficit should be increased by such amounts to the total sum of $258,270.47. Respondent determined that these amounts were capital expenditures and not proper charges against petitioner's earnings and profits. The three items which petitioner contends should be added to its deficit were not charges incurred by petitioner in the operation of its business. The items of $15,700.88 and $11,520, respectively, represent the aggregate payments of real estate taxes on land of the Pennsylvania Forge Company and interest on purchase money mortgages executed by that company for the years prior to 1937. In the first issue, we determined that identical payments in the taxable year were capital expenditures. For the same reasons set forth in the opinion on that issue, the same determination is made as to the aggregate payments. Petitioner's liability *161 for payment of the accrued interest on the bonds of Pennsylvania Forge Company arose out of the same agreement as its liability for the payment of taxes on its subsidiary's real estate. It was part of the consideration paid by petitioner for the transfer of its subsidiary's assets free from the lien of the bond indenture. Therefore, the accrued interest in the amount of $67,215 represented capital expenditures and was not a proper charge against petitioner's earnings and profits. It is immaterial that these items were claimed and allowed as deductions in prior years. ; . It is, therefore, concluded that petitioner's deficit in accumulated earnings and profits as of December 31, 1936, is in the amount of $163,834.59. As the credit provided by section 26 (c) (1) is larger than the credit under section 26 (c) (3), it is necessary to first consider section 26 (c) (1) in determining petitioner's undistributed net income. Petitioner relies on the prohibition on the payment of dividends contained in the agreement executed by it on July 1, 1933. Petitioner *162 had been incorporated on November 8, 1928. For the calendar year 1929, it reported a net income of $21,990.64; for 1930, a net loss of $3,397.05; for 1931, a net loss of $98,618.08; for 1932, a net loss of $178,654.84; and for 1933, a net loss of $79,799.31. On July 1, 1933, it owed its creditors the sum of $119,500. On that date, it was agreed between petitioner and its creditors that the indebtedness would be repaid by semi-annual notes so that the entire principal of the indebtedness would be paid on June 30, 1937. By paragraph 7 of the agreement, petitioner agreed that "Until the notes hereinbefore mentioned are paid in full no dividends shall be declared upon the capital stock of The Corporation." The balance of the indebtedness became due and payable during the taxable year. At the end of the taxable year, $14,937.50 of the indebtedness was outstanding and unpaid. Respondent concedes that the contractual provision prohibiting the payment of dividends was such as meets the requirement of the statute. In connection with the applicability of section 26 (c) (1), no issue is raised by him that petitioner could have paid a dividend in stock. His only contention is that petitioner *163 could have paid the indebtedness in 1937 and so have removed the restriction against the payment of dividends. This contention, however, must be rejected. Respondent admits that over the entire nine years of petitioner's existence, it had accumulated a deficit in earnings and profits in the sum of $163,834.59. Its cash position in 1937 was very low. During most of that year, its bank made a service charge for handling its account, and its trade creditors charged additional interest because petitioner was unable to discharge its obligations on time. Petitioner's monthly cash on hand was insufficient to pay its creditors in addition to such immediate current expenses as wages and accounts payable. Because of a lack of sufficient cash to meet all of its obligations, petitioner was unable to make a payment in the sum of $50,000 due January 2, 1938, and was also delinquent in the payment of interest amounting to $6,000 which was also due January 2, 1938. The creditors who signed the agreement of July 1, 1933, were pressing petitioner and refused to advance any more money to it. Because of its poor financial condition, petitioner was unable to secure loans from banks. Although petitioner's *164 net carnings for the taxable year were substantial, it was not until 1938 that petitioner's cash balance reflected the increase in earnings. This was for the reason that the increase in volume of business required the prompt use of cash to purchase raw materials in order to complete the orders on hand. Respondent on brief cites petitioner's balance sheet as of the close of the taxable year as follows: Assets
Cash
$ 46,335.44
Notes Receivable
888.00
Accounts Receivable
191,559.17
Bonds
38,000.00
Total
$276,782.61
Liabilities
* Notes Payable
$ 14,937.50
Accounts Payable
68,020.42
** Mortgages Payable
51,041.25
Accrued Interest
6,488.00
Accrued Taxes
82,562.78
Other Accrued Exp
14,425.94
Total
$237,475.89
From these figures, he argues that petitioner had a balance of $39,306.72 in liquid assets over current liabilities to pay the indebtedness. However, among the assets, he included bonds in the amount of $38,000. Not only were these bonds not liquid assets, but the evidence before us indicates that they were of little value. *165 These bonds were part of the $500,000 issue of the Pennsylvania Forge Company. The only security for their payment was vacant land owned by the Pennsylvania Forge Company, the taxes on which had been paid by petitioner. It is apparent from all the evidence that petitioner was not in a position to liquidate its indebtedness to its creditors in the taxable year. This is not a case where a corporation with cash and liquid assets greatly in excess of both its current obligations and its secured obligations has delayed the removal of the restriction for an unreasonable length of time, for the purpose of obtaining the credit under section 26 (c) (1). See, . Its failure to pay off its indebtedness during the taxable year was actuated by sound business purposes. , ; affd., . Upon all the evidence and under all the circumstances, it is held that petitioner is entitled to a credit under section 26 (c) (1) in the amount of its adjusted net income *166 in computing its undistributed net income for the taxable year. In view of this holding it is unnecessary to decide whether petitioner is entitled to a credit under section 26 (c) (3). Decision will be entered under Rule 50. Footnotes
*. Includes $3,481.74 carried over from predecessor, i.e., Pennsylvania Forge Company. ↩
**. Includes additional provision and charges of $10,338.51 to cover a bad debt incurred in excess of the 1/4 of 1% provision therefor. ↩
(c). Contra amount of $257.06 charged off and subsequently reversed on books, but not eliminated by Revenue Agent.↩
1. SEC. 26. CREDITS OF CORPORATIONS. In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax - * * * * *
(c) Contracts Restricting Payment of Dividends. - (1) Prohibition on payment of dividends. - An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1. 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account. ↩
2. SEC. 501. ADDITIONAL CREDITS FOR UNDISTRIBUTED PROFITS TAX. (a) Amendments to the Revenue Act of 1936. - (1) Section 14 (a) (2) of the Revenue Act of 1936 (relating to definition of undistributed net income) is amended to read as follows: "(2) The term 'undistributed net income' means the adjusted net income minus the sum of (A) the dividend paid credit provided in section 27, (B) the credit provided in section 26 (c) relating to restrictions on payment of dividends, (C) except in cases where section 26 (c) (1) is applicable, the deficit credit provided in section 26 (f), and (D) the redemption credit provided in section 26 (g)."
(2) Section 26 (c) of the Revenue Act of 1936 (relating to credits of corporations) is amended by amending the heading to read as follows: "(C) Restrictions on Payment of Dividends. - " and by amending paragraph (3) to read as follows: "(3) Deficit corporations. - In the case of a corporation having a deficit in accumulated earnings and profits as of the close of the preceding taxable year, the amount of such deficit, if the corporation is prohibited by a provision of a law or of an order of a public regulatory body from paying dividends during the existence of a deficit in accumulated earnings and profits, and if such provision was in effect prior to May 1, 1936. "(4) Double credit not allowed. - If more than one of the credits provided in the foregoing paragraphs (1), (2), and (3) apply, then the paragraph which allows the greatest credit shall be applied; and, if the credit allowable under each paragraph is the same, only one of such paragraphs shall be applied." (3) Section 26 of the Revenue Act of 1936 (relating to credits of corporations) is amended by adding at the end thereof the following new subsections: "(f) Deficit Credit. - The amount by which the adjusted net income exceeds the sum of (1) the earnings and profits accumulated after February 28, 1913, as of the beginning of the taxable year, and (2) the earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year). For the purposes of this subsection, earnings and profits of the taxable year shall be computed without diminution by the amount of the tax imposed under section 14, 102, 103, or 351 for such taxable year; and earnings and profits accumulated after February 28, 1913, as of the beginning of the taxable year, shall be diminished on account of the tax under section 14, 102, 103, or 351 for any previous taxable year only by the amount of such tax as computed under the amendments made by section 501 of the Revenue Act of 1942.↩
*. Past due notes involved herein. ↩
**. Shown as $215,626.25 on balance sheet but only the above amount was due in January, 1938.↩